A very good morning to everyone. The first case on today's call is Loertscher v. Anderson. Mr. Stilin. Misha Stilin, Solicitor General, on behalf of the defendants. Plaintiff is challenging a law in a state where she no longer lives based upon a vagueness theory that the Supreme Court has unanimously rejected. Plaintiff has not cited a single case from any court holding that a plaintiff that has moved out of a state has stated to challenge that state's laws and has not cited a single case from any court holding that the commonly used terms in Act 292 are unconstitutionally vague. Now, as a threshold matter, Plaintiff's entire move out of the state of Wisconsin. Plaintiff moved out of Wisconsin a couple years ago, and the only record evidence that she points to in order to bolster her connection with Wisconsin entirely refutes any argument that she has any continuing connection with the state sufficient to have standing. That record evidence, which is at her deposition at 174 through 175, indicates plainly that she has visited Wisconsin only one time since she left the state a couple years ago and that she has no intention of moving back. There is absolutely no record evidence to support her claim in her briefs that she moved out of Wisconsin because of this Act or that she would move back or is likely to move back or is reasonably possible to move back if this law isn't joined. Did she move out, did you just say because of this Act? In other words, to stay away from whatever follow-up there is would be with this Act after a baby was born? Your Honor, there is no follow-up with regard to the Act. The proceeding against her is closed. She claims in her brief that she moved out of the state because of this. But if one looks at the underlying record citation to that, it's her deposition testimony at 174 through 175. There is absolutely no support, not even a suggestion that that is why she a naked assertion without any record support. And of course, we're already at the summary judgment stage, so that is insufficient. That then puts her in the same position as a student in the Supreme Court's Camerata case when the student had moved from Oregon to Florida. And the Supreme Court had no trouble concluding in that case that that move from Oregon to Florida mooted the lawsuit. And this has, of course, been the uniform rule in every case that either side in this case has cited. In every case where a plaintiff has moved out of a state with no showing that they intend to move back, the court has held that the case has moved and there is no standing. Now plaintiff's reliance on the evading review exception does not salvage her lawsuit. That exception applies only in exceptional circumstances where failure to apply the exception would mean the issue would always evade review. That is certainly not the case when you think about the Camerata category of cases where the case is moot because the plaintiff has moved out of the state. Because of course, if the court holds, hey, your lawsuit is moot, you have no standing because you moved out of the state, a plaintiff still living in the state would not have that same mootness problem and could make all of the same arguments that you could make. So for that reason, the rationale of the evading review exception does not apply to our situation. What if some general, what if somebody moved because of military deployment, takes the family to a military base, would you say that they've left the state? I think if the military base is outside of the jurisdiction. I think the Supreme, this court has said that the term, the inquiry is whether there's likely to move back in the future and the Supreme Court has used terms like reasonably probable. So I think the question would be, is the move such that it's permanent or is it just a stationing and they'll move back? I think that's the kind of approach that one would need to use if unlike in this case, you had a case that there was credible evidence that there was a likely possibility or reasonable probability of a move back to the original state. Now if there are no further questions outstanding, I'd like to talk a bit about the merits. The statutory terms used in Act 292 to identify the most serious, the most harmful substance abuse, habitual, severe, lack of self-control, substantial risk, are the typical, indeed the best terms to separate serious, harmful substance abuse from sporadic, less harmful substance abuse. That is why they make up the core definition of addict under the Federal Control of Substances Act, make up the definition of those that can be civilly confined under the Uniform Alcoholism and Intoxication Treatment Act, which states around the country have are part of the definition of habitual drunkard in the federal immigration laws, which if someone is found to be a habitual drunkard, that has serious consequences for folks who are to be removed from this country. The sliding scale, case-by-case approach that Act 292 uses and that all of the statutes that I just referenced use, is precisely the approach that the Supreme Court unanimously blessed in the Pearson case. In that case, the Minnesota Supreme Court had interpreted a civil confinement statute to have three requirements. Habitual misconduct in sexual matters, lack of self-control, likelihood of harm to others. The similarities between those terms and the terms that Act 292 are evident. In fact, a lot of those terms are exactly the same. And Act 292 is constitutional for the same reason that the statute in Pearson was constitutional. And I will note again that the Supreme Court was unanimous in Pearson and held that the construction by the Minnesota Supreme Court adopting the very terms that are in Act 292 were so clearly non-vague that they, quote, destroyed any vagueness challenge. In light of Pearson, it is not surprising that courts throughout the country, including this court, have held time after time that the very terms in Act 292 are not vague. Just to take one example, this court's Sheehan decision, which held that the term habitual was not vague. Just this year, the Ninth Circuit sitting in bank in the Ledesma Casino case held that the federal immigration law's term, habitual drunkard, was not vague. And of course, Act 292 is not vague for the very same reasons. I think it is striking, in fact, that plaintiffs have not identified any better way that the state could have separated out serious, harmful substance abuse from more sporadic, less harmful abuse. As the Supreme Court said in the Perillo case, the vagueness doctrine cannot be used as an insuperable barrier to solving a particular problem. Since the state has used the terms of the art that are most appropriate in this area of law, and since there is no suggestion that there is any better terms that could be used, that defeats any notion of vagueness right there. How are these people determined in the first place? How are these women found to be in need of this approach from an intake worker or whatever? All right. There are several steps that happen, each of which screen out unjustified cases. First, a case typically begins with a referral, usually by a medical professional or law enforcement professional, to Child Protective Services. These are the same people that deal with child abuse cases. If there is a determination made at that threshold, that the person does not meet the statutory threshold, then nothing goes forward. It would seem there would be a lot of women that maybe need this service and they're never going to be detected. That's correct, Your Honor. Given the various barriers in the system, and given that many women are not going to be reported, given that there could be a lack of proof, there could be situations where doctors are unwilling to testify for whatever reason, this act certainly will not cover every woman and every unborn child that could be serviced. But that is just a line-drawing problem the state had to draw, because obviously under-inclusiveness is a problem. We would like to help every woman who is habitually using drugs with lack of self-control or harming an unborn child, but we don't want to sweep too broadly. So I think what the state has reasonably done is it has taken the terms of art that are used in the severe substance abuse area and has channeled them through the same folks that deal with child abuse. And I think that makes a lot of sense, because of course if a mother is addicted or taking a significant amount of drugs while she is pregnant, if she has the baby and she's still taking those drugs and still having those problems, she will be dealing with the same folks that are administering this regime. So it makes sense to use the terms that are best used in the area of substance abuse and to have them administered by the professionals that deal with child abuse and by the courts, the Wisconsin courts that deal with child abuse cases. And that is the next answer to your question, Your Honor. Once the person has been screened in and there are different avenues based upon whether there needs to be a temporary custody or not, ultimately this is all funneled through Wisconsin courts, the Wisconsin courts that are used to dealing with child abuse. And of course in our legal system, having courts be the check to see that the legal standards have been met to make sure that things are done correctly. The gold standard in our system is supervision by courts. So I think that is another powerful reason why these commonly used terms are not vague. For some period of time, the intake worker has a lot of power it seems. And I'm not sure at what point it gets into more of a due process situation. If there's any kind of confinement or need of counsel, that sort of thing. And that just seems to be, that intake worker is pretty important. Well, Your Honor, so if you have a temporary custody situation, the intake worker at most can detain the mother for 48 hours. That's a very tight window that the statute permits before there has to be supervision by the Wisconsin courts. But there's a lot that goes on before it gets into even the confinement. I assume they deal with the intake worker. I'm not criticizing, I'm just curious if that's a pretty important position and I don't know at what level of, I don't know, education and experience, etc., an intake worker has to have. Well, let me differentiate. I think we're talking about two different kinds of intakes. There is the people who work for the county. They're the ones that offer entirely voluntary services. If someone's screened in as potentially meeting the standard, they come in, they tell the mother, hey, we've got these voluntary services we can use. If it becomes a detention situation, then it transitions to a court intake worker. Those are the people that deal with, usually with born children. And so those are the people that have the 48-hour window. So there's what you refer to as the intake worker in the county that just offers only voluntary services, and then there's the court intake worker that is triggered if we have a temporary custody situation. Okay. So that distinction, that helps, I guess. Yes, Your Honor. And then just a couple more brief points why the district court's facial invalidation of the statute. We think the statute is constitutional as a whole, but why the facial invalidation of the statute is particularly inappropriate. As our colloquy a second ago demonstrates, the vast majority of the Act's applications do not deal with involuntary treatment. The vast majority deal with voluntary services. You need to have the trigger, the statutory trigger, in order to be able to provide the services that the vast majority of women who interact with the system find valuable and gladly take. The district court's facial injunction blocks all of that because once this Act is disabled, there could be no screening. Another reason why the facial invalidation is inappropriate here is because the motion of conduct covered by the Act is already unlawful. It has to do with illegal controlled substances. Now, this court in the Sheehan case, where this court upheld as not unconstitutionally vague a habitual truancy statute, faced a similar argument. The student said, hey, because this is a sliding scale, habitual, I don't know how to comply. And what this court said is you shouldn't be truant, period. So the argument that you are concerned, that you don't know how many times you can violate the school truancy policy, is not a very powerful one. Same here. In this circumstance, we have habitual, multiple times a week, use of methamphetamines, which are, of course, illegal under federal law and under state law. It is not a particularly powerful argument to say that, well, I don't know how many times. Can I use methamphetamines three times a week, two times a week, six times a week? That runs right into this court's decision in Sheehan. And then finally, this is a point I've already made, but just to reemphasize, one of the inquiries that the Supreme Court has said is appropriate in determining vagueness is what is the system like that determines compliance. Here, we have a system that is entirely funneled to the supervision of Wisconsin courts. In that sort of circumstance, that cuts strongly against any vagueness finding. If there are no further questions, I would reserve the balance of my time. Thank you, Mr. Solicitor General. We'll hear now from Ms. Rosenblum. May it please the Court, Nancy Rosenblum for Plaintiff Appellee Tamara Leitcher. The District Court was correct in granting summary judgment invalidating the statute as unconstitutionally vague, and we ask this Court to affirm the ruling and the injunction against enforcing Act 292. Act 292 is not a benign public health law offering voluntary services as the state would have this Court believe. The Act creates a statutory scheme that is unique in this country. There is no other law like this in another state, in which juvenile courts get jurisdiction over and the power to detain adult women who are carrying a fertilized egg embryo or fetus, who are alleged to have used any amount of alcohol or drugs in a type of child abuse proceeding before a child is born. Women may be detained or forced into treatment in confidential court proceedings. The fact that they're confidential means that there is no way to identify these cases or monitor them. In fact, when the state 30B6 witness was deposed, she said the state does not even track how many women are detained against their will under this law. The state does not track what types of so-called treatment people were forced into when they are detained. So when Mr. Taitlin says that the vast majority of these are not mandated services, we simply have no way of knowing, and we did extensive discovery here in the state that they do not track that. The standard of the law is so vague. It's a combination of terms and standards that are so vague that Wisconsin women cannot possibly know what conditions would subject them to the law. Also, there's a wide range of people empowered to enforce it. We heard earlier about the intake workers who are not trained in assessing substance use disorders or what treatment might be appropriate for someone. The people empowered to enforce the act lack any meaningful standards so that arbitrary enforcement has been the result. From the few cases that have become public, we have seen that, including the case of Ms. Lacher. The standards we, again, in deposition asked the state witnesses, are there particular standards for this type of case that are different from the normal child abuse and neglect standards? And the answer is no. There are only a few pages in the Child Protective Services Guide devoted to these Act 292 type of cases, and in those pages, there is nothing. The testimony shows this and the standards show this. There is nothing that tells workers how to determine who should be swept within this law, how to determine what the treatment might be. All of this happens without a right to counsel for the woman at crucial stages of the proceeding. She can be detained for long periods of time without counsel, yet a guardian ad litem, who in Wisconsin must be a lawyer, is immediately appointed for the fetus. In the case of Ms. Lacher, the guardian ad litem, having never even talked to Ms. Lacher, who, after all, was carrying the fetus, who is now her two-year-old son, guardian ad litem never even spoke to her, yet at the first proceeding admitted on behalf of the fetus all of the child abuse allegations that had been made against Ms. Lacher. This case is not moot because Ms. Lacher has already given birth to her son while the case was litigated. Pregnancy is a recognized exception under capable of repetition yet evading review. The case is also not moot because Ms. Lacher is currently not living in Wisconsin. Is there any language that you would look at that could be amended into this statute that would not be vague? Your Honor, speculation about what statute might be constitutional is not the issue here, but any language that tries to take into account the risk of harm, risk of physical harm to a fetus and a child once born is very problematic. As every one of the medical experts in this case, and there were eight who submitted reports, as everyone on both sides acknowledged, it is impossible to tell for sure what the effect of a certain drug or alcohol, prescription drugs, which are also included in this law, so any standard having to do with pregnancy and possible outcomes for the baby is going to be problematic under the vagueness doctrine. Are you arguing in effect that the state cannot have a child abuse law that pertains to an unborn child? We're arguing, Your Honor, that this law is unconstitutional. I don't want to speculate about any possible use of the law, but... Well, there's a whiff of it in your brief and there was more than a whiff in a statement you made a few minutes ago. It is inappropriate for a juvenile court to have the power to deprive adults of their liberty. That is a problem. Those proceedings are confidential. There is no power in what I would call a normal child abuse neglect proceeding to detain a parent, and here we're dealing with people who... The law reaches as far back as before women even know they're pregnant. It reaches as far back as before the medical definition of pregnancy, a fertilized egg, which may not even be implanted yet. So any Wisconsin woman of childbearing age and ability could be subject to this law if she's using drugs or alcohol. As I understand it, your argument then is there should be no law that can intervene and overcome whatever the mother's desire for an unborn baby. So you're saying there should be no external protection for that unborn baby, regardless of what the mother's behavior is. Respectfully, Your Honor, I don't believe I have said that and didn't wish to say that here. I'm trying to maybe clarify it in my mind. If you're not saying that, then there is times when there could be intervention against the mother's will. There shouldn't be government intervention that deprives the liberty of a particular class of people, pregnant women, in a way that's different from all others. For example, Wisconsin's Civil Commitment Law, Chapter 51, could be used to try and civilly commit a pregnant woman, just as anyone else, if that person meets the standards of the Civil Commitment Law. In fact, Act 292 allows the courts who hear those proceedings to opt for the Chapter 51 civil commitment option, if they'd like, in cases where there is what the state would call a severe problem. I would like to point out that the state has changed its position rather dramatically during the course of this case. In the district court below, the state talked about use, talked about behavior, and now suddenly in the state in its briefing in front of this court, and in its state papers to the Supreme Court and this court, said this law only pertains to severe addiction. That is not what the state's position was below, and the state is using a scare tactic, talking about the most outrageous cases in its brief. And by the way, the two cases they're able to talk about are not part of the record. They were not in discovery. There were no documents produced about those cases. But the point is that the state is saying, this is mostly a voluntary law. We shouldn't worry about it too much. In fact, when the state tries to minimize how intrusive Act 292 is upon pregnant women who are subjected to it, and there have been thousands reported, and many hundreds who have come under the Act, the discovery shows us, the state says it's voluntary, it's entirely voluntary, and Mr. Tatelin said today, it's about offers of services. But the statutory design itself and the operation of the statute show that as the district court described here, any services suggested by child protective authorities come with a threat of a child, an unborn child. Is there any way the statute could be so that it would pass muster? Your Honor, speculation about how the language could be changed is really not something... This was an exercise the judge I clerked for put me through all the time on vagueness cases. You think it's vague, write a better one for me. Show me how you'd write a, how would you write a better one? The Solicitor General has said in the context of this case, this is, these are the terms of art that are usually used. This is the language that is workable. You say it isn't. All right, what is? I will answer your question. I'm not trying to be evasive. We do believe that certification to the Wisconsin Supreme Court would be inappropriate since it's the legislature's job and the certification standards are not met. If the state of Wisconsin, assuming it cares about the health of babies and children, Wisconsin can continue to do what it does. It can offer voluntary services. It is not true that they need a child, an unborn child abuse proceeding, which is a, was a brand new thing when this law was written, to offer services if they care about the opioid crisis. If they care about the health of mothers and babies, the state legislature could pass more laws offering more health treatment, providing funding for health care that is voluntary and confidential. Every one of the medical experts on the plaintiff's side and some on the state's side. What can they do to save the unborn child of the uncooperative mother? What can they do? The experts in this case have testified, and I commend in particular the report and testimony of Dr. Andre Jones, who is one of the world's leading experts on the impact of coerced treatment in pregnant women. They all uniformly agree that coerced treatment is not effective. The amicus brief by the ten major medical organizations, including the American Academy of Pediatrics and the AMA, say coerced treatment does not work. I've got a question for you about that since you bring it up. Why is the advice which those organizations give this court in its amicus brief different from the advice that they give the general public on their websites? I'm not sure I understand. The websites tell pregnant women to stay away from the stuff. That's not what the amicus brief says. I think the amicus brief could be certainly read to support that while voluntary treatment is the best for people who actually have a substance use disorder, that because the risks are unknown, as all of the medical experts testified in this case, the risk of use of a particular drug or alcohol varies by quantity, amount, it varies by the person. Women who do everything right, who do everything their doctors say. I'm going to submit to you that brief has a credibility of zero, given what these physicians are telling the public. A woman goes in to a doctor for her first visit, when believing she's pregnant, she's told to stay away from the stuff. And if the doctor doesn't tell her, his malpractice insurer gets very angry with her. And that's not what your amicus brief is saying. Judge Ripple, the doctors, all the experts in this case and in the amicus brief, say of course we're going to counsel people that they should have good nutrition when they're pregnant, that they should not work in an environmentally toxic environment, that they should not take controlled substances where the risks are unknown. The fact is though also that many of the substances covered by Act 292 are legal, prescription drugs, alcohol, but also many of those substances don't cause the harms that are commonly believed to be harmed. So to sweep in every woman who has any kind of past use, as in the case of Alicia Beltran, who we cite, who brought a habeas proceeding, she went voluntarily to seek health care and acknowledged she had overcome a previous dependency on opioids. And what happened? She was arrested. She was shackled. She was taken away and detained because somebody in the county decided she had to be in a treatment facility and get more treatment for this addiction she no longer had. By the way, the treatment facility that she spent 70 days in... That particular individual, was she accorded no relief by the courts of Wisconsin? She was not appointed a lawyer, as this Act does not provide for the appointment of a lawyer until a much later stage, and she spent 70 days in a psychiatric hospital, by the way, not receiving any kind of drug treatment other than counseling, before she was able to find a lawyer and bring a habeas proceeding and get out. There are only a few examples known to us because the proceedings are confidential and the records are confidential. The ones we know of, the three we know of, which, including Ms. Leitcher, were all women voluntarily seeking health care to have a healthy pregnancy for babies they wanted. If I may change the perspective just a little bit, you mentioned that there are quite a few salutary health programs which are authorized by the statute. The Solicitor General has indicated that under the District Court's injunction, those programs are now enjoined. Do you agree? That is absolutely not correct, Judge Ripple. These are not special new programs that were authorized by this statute. These are voluntary drug treatment programs that are available, that are advertised on the state's website, that people can try and get into if they have a substance use disorder. So your view, you disagree then with the Solicitor General on the breadth of this injunction? Absolutely, Your Honor. The injunction enjoins use of Act 292. It by no means enjoins the provision of voluntary services to anyone in Wisconsin. Because if the Solicitor General's view is right, I'm not sure why he hasn't asked for a stay of the injunction, at least insofar as those programs are concerned. There is a stay pending, Your Honor, against the injunction. This Court denied the stay, but the entire Supreme Court heard a stay application and stayed the injunction. I did stay. Pending this appeal. I'm sorry. I do want to call that, yes. So what's important about the language of the statute here, too, is that it must be taken in context, and it must be taken all together. It's impossible to pick out a particular term like habitual, a particular term like risk, and to evaluate the statute that way. The state says the plaintiff hasn't come up with a better way, or a better statute. It's not the plaintiff's burden to do that. This Court is only reviewing vagueness and reviewing the District Court's ruling. The District Court did find that other constitutional rights are implicated, plainly implicated. But those rights of liberty and medical privacy and so forth are not before this Court right now. The District Court has not yet decided them. Why isn't it moot? The case is not moot, Your Honor, because pregnancy is of short duration. It fits right into the standard of capable of repetition yet abating review. It also could apply to Ms. Leitcher again. She has... If she comes back in the state? Yes, she has. She has testified. She has family here. She has visited several times, even though she felt harassed and a need to leave the state and worried about future harm. She told the District Court and said again in her deposition that she has family ties and that she could certainly be pregnant again in Wisconsin. And even if she were not using drugs at the time, which she has not since she found out she was pregnant with her son, who is the subject of this case, even if she were, her past behavior could be held against her just like it was for Ms. Beltran. So she is quite right to be concerned about coming to Wisconsin. And, you know, the deposition transcript excerpts you have don't show all the tears that were shed when she was asked the question about coming back to visiting and living in Wisconsin. So your view is that even her transitory presence in the state would subject her to the act? Her presence out of state might be transitory. She is a Wisconsin woman. She grew up here. She lived here until she completed everything required by the consent decree in this case, until the child maltreatment finding against her was reversed. My point is she doesn't have to establish residence to be subject to the statute. That's your basic point. Yes, Your Honor. That's correct. Additionally, the Weinstein case from the U.S. Supreme Court talks about capable repetition. Super Tire case and this court's Majors case show us that if this is a general policy of the state, that the state is certainly going to continue to enforce against women. It need not be the same person. If this court were concerned that Ms. Leacher might not be back in the state sufficiently, this is governmental action that has not ceased because it is a fixed policy, just as it was in the Majors case from this court. So if someone in a similar situation goes through, whatever your plaintiff is, you'd say is that a new case or is that whatever you want to call it, subject to review when it wasn't in the first place? The whole idea of the capable repetition yet evading review doctrine is that if a statute like this is designed to apply only to pregnant women, pregnancies of short duration, that there will never be a plaintiff who can effectively challenge the law if it's required that the same person be affected over and over. Here it's appropriate to uphold the injunction against the statute in Ms. Leacher's case herself because it may apply to her again. It also may apply to someone else because it is a fixed policy. I see the red light is on. Thank you. Thank you very much, Ms. Rosenblum. Thank you. Mr. Solicitor General, you have six minutes. If I may, sir, it seems to me that one of the areas where you've taken a hit at least to your ship has the question of whether the remedies to get out of custody, if you're put into custody, are adequate and sufficient. And the second issue where your ship again maybe has taken a hit is to whether the act is sufficient and afforded counsel to the woman who is threatened with a custodial arrangement. Thank you, Your Honor. With regard to the first point, any custody situation is supervised by a Wisconsin court. In our country, supervision by a court is the gold standard of procedure. So I think with regard to that, the state could not have provided a more robust procedure than supervision by a court. Now, with regard to the right of counsel, the statute provides for a right of counsel regardless of ability to pay. If there is some ambiguity as to whether counsel has been in fact provided or is not provided in certain circumstances, that I think would be amenable to an as-applied situation where if there was a deficiency found on the right to counsel under the statute, under the applicable law, then a much more limited remedy than a facial invalidation of the entire statute would be appropriate. And I think that brings me to one of the points that I wanted to make on rebuttal, which is I think what we've heard here, the complaint that plaintiffs have with the statute really has nothing to do with vagueness. The terms of the statute are the terms of art used in the substance addiction area. The problem they have is with the public policy disagreement that the statute should not have been enacted because plaintiffs like the amicus and the AMA believe that substance addiction is better dealt with voluntarily. Now, what's important here, and I think you can see this most clearly on page 5 of the amicus brief, is they're not really talking about just a limited circumstance of Act 292 or dealing with pregnant women who are substance addicted. Their view is that substance use is better dealt with voluntarily, period, because it is a medical problem, not a criminal problem or a civil confinement problem. That is certainly a public policy view, one that would, of course, be quite revolutionary. We have civil confinement in this country for severely addicted folks. We also have a criminal system, not applicable here, but that takes a different view of the AMA. And so the AMA and plaintiffs' objection that substance addiction should never be dealt with through civil confinement, should never be dealt with through courts, is something better presented to a legislature and not through the backdoor of a vagueness challenge that I think is not really the basis for the litigation. We have some claims about how often the services here are voluntary. The statistics that we have in the record is that there were 3,326 cases screened in by the counties. That's on docket. The string citation on that is District Court Docket 193, paragraph 189. At the time of the stay motions, it was undisputed that there were 25 cases that are potentially involuntary, the ones before the courts. So we had over 3,300 versus 25, so the court can see the scope of the voluntary aspects of this. Could you give me those numbers again, Jim? So the docket entry is docket 193, paragraph 189, and that's if you add up those numbers, you get the 3,326 screened in cases. 2,000? 3,326, and those are the screened in cases. 3,326? Yes, that's right. That's between 2005 and 2014, right? Yeah, I don't remember what the start point was, but yeah, they started keeping track at one point. It was over a couple-year period, and that's just compared to 25. So the gap there is more than 100 to 1, so it's quite broad. And then with regard to what the injunction does, this dispute between us and the plaintiffs about whether the injunction truly cuts off significant numbers of voluntary services, these are social worker services that are provided, which was our view, and their view that it doesn't cut them off, was fully aired in the stay briefing. The United States Supreme Court, in a quite extraordinary step, with only two justices noting their dissent, granted our stay while the case was still pending before this court. Inherent in that stay grant, while it's obviously just a one-line order, is they agreed with our argument that in joining the statute would subject the state and its citizens to irreparable harm. So while, of course, we don't have a specific finding for the Supreme Court, I think it's pretty clear that our argument that it would be deeply disruptive to join this entire law carried weight with the justice of the Supreme Court, with only two of them noting dissents. So I heard an argument that we had to change position because we used the term severely addicted. We used the term addicted not in terms of a clinical diagnosis, but in the exact same way that the term addict is used in the Federal Controlled Substances Act, which is severe use, lack of self-control, habitual use. So the term addict, which is the one that we used in our brief that they attack us for using, was just the way that the Federal Controlled Substances Act, which is obviously the governing statute in this country for controlled substance abuse, uses that term. And then finally, with regard to standing, I would urge this Court to take a look at pages 174 and 175 of her deposition. That is the entirety, the entirety of her factual basis for claiming she has any connection with the state of Wisconsin. I think that Your Honors would find that there is absolutely nothing there in that. But I am concerned about this issue of transitory presence. The statute does apply to someone who is simply in the state as a transient, am I right? All right, Your Honor. And so... You could pick somebody up at the bus station, changing buses on their way from Chicago to Minneapolis, and apply the statute to them. That would be extremely speculative, Your Honor. You would need some sort of a referral. This notion of past use has absolutely no record of support. You need a current substance abuse problem. You need current harm to the unborn child. And I think in discussing this transitory issue, I think the Court should apply this Court's language from Higginson, which is, is that likely? Is it likely that Ms. Leitcher, who has only been in Wisconsin one time other than for a deposition, in the years since she moved out of the state, is it likely that she would be scooped up at a bus station with no basis for a referral? I think that is deeply speculative. And given that the capable of repetition and review exception is, as the Supreme Court said, in extraordinary circumstances, I don't think that that kind of speculations about transitory bus stop comes close to rising to the level of likelihood that this Court said in Higginson, or extraordinary circumstances, what the Supreme Court has said about this doctrine. If there are no further questions, thank you, Your Honors. Thank you, Mr. Solicitor General. Ms. Rosenblum, thank you very much as well.